## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

———————————————————————
                                        :
STANLEY COFFEY,                         :
                                        :
           Plaintiff,                   :          No. 3:11-cv-784
                                        :
v.                                      :
                                        :
CHRISTOPHER CALLAWAY and                :          **FEBRUARY 19, 2015**
SCOTT MEIKLE,                           :
                                        :
           Defendants.                  :
———————————————————————

### RULING ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**HAIGHT**, Senior District Judge:

In this civil rights action pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff, a resident of Norwich, Connecticut, claims that Defendants, members of the Norwich Police Department, violated his federal constitutional rights during an altercation in front of plaintiff's home on May 12, 2009. Defendants move for partial summary judgment under Rule 56, Fed. R. Civ. P., dismissing certain claims on their merits or alternatively, on the ground of qualified immunity. Plaintiff opposes that motion. Counsel have briefed the issues and argued the case at a hearing. This Ruling resolves the motion.

### I

The underlying facts in this case are developed by affidavits of individuals with personal knowledge, discovery depositions, testimony of witnesses at a state court criminal trial arising out of the incidents in suit, and various exhibits. The facts recounted in this Part are undisputed or indisputable.

1

On May 29, 2009, at about 8:00 p.m., the City of Norwich, Connecticut Police Department received a telephone call from George Laughlin, who resided at 54 Division Street in Norwich. Laughlin complained about a loud party disturbance outside his home.  At 8:15 p.m. police officers Christopher Callaway and Stephanie Reichard were dispatched, in separate police cruisers, to that address.  Callaway arrived first, followed by Reichard, who was acting as Callaway's backup.

When Callaway arrived at the scene, he observed a number of individuals standing on a public sidewalk in front of a residential house at 58 Division Street.  It seemed to Callaway that these individuals were generating loud noises.  He observed that some were drinking beer.  Callaway asked that the party break up.  Most of the people returned to their nearby homes in the neighborhood.  But two individuals, Stanley Coffey and his brother Jason Coffey, remained outside their residence at 58 Division Street.  Officer Reichard, who arrived on the scene after Callaway, sought to encourage the neighborhood residents to remain in or on the porches of their homes.

Stanley Coffey and Officer Callaway became engaged in an altercation.  The manner in which that altercation came about is in dispute.  It is undisputed that Callaway asked Stanley Coffey to leave the public sidewalk and private yard, and re-enter his home at 58 Division Street.  Coffey refused to do so.  Callaway called for additional police presence, and when police officer Scott Meikle responded, Callaway and Meikle arrested Stanley Coffey on two misdemeanor charges: breach of the peace, in violation of Conn. Gen. Stat. § 53a-181a(5), and interfering with an officer, in violation of Conn. Gen. Stat. § 53a-167a.

§ 53a-181a(5) provides in relevant part:

> (a) A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person . . . (5) in a public

place, uses abusive or obscene language or makes an obscene gesture
. . .

§ 53a-167a provides in relevant part:

(a) A person is guilty of interfering with an officer when such person obstructs, resists, hinders or endangers any peace officer . . . or firefighter in the performance of such peace officer's . . . or firefighter's duties.

Coffey was transported to Norwich Police Department headquarters, booked, released on bail, and acquitted in a subsequent trial before a Connecticut court.

Stanley Coffey commenced this action on May 12, 2011, by filing a complaint against Norwich police officers Callaway and Meikle.  The operative pleading is an amended complaint [Doc. 17], filed on March 1, 2012, which contains three counts.  Count I alleges that Meikle and Callaway[1] violated Coffey's "fourth amendment right to be free from excessive force, free from an arrest without probable cause, and free from unreasonable search and seizure."  ¶ 11.  This is, in essence, a claim for false arrest.

Count II alleges that defendants arrested Coffey "because plaintiff had declared that the defendant Callaway did not have the right to order the plaintiff to go into his own residence with no legal justification for doing so," ¶ 18, the actions of the defendants "therefore constituted the violation of the plaintiff's right to free speech."  ¶ 19.

Count III alleges that defendants retaliated against Coffey for exercising his rights to be secure on his own property and of expression by assaulting him and then fabricating facts to justify his arrest and prosecution.  ¶ 36.

---

[1]  The complaint spells this defendant's last name as "Call**o**way."  In his affidavit, the defendant spells his name as "Call**a**way."  I will use the latter spelling.

Counts II and II are, in essence, claims for First Amendment retaliation.

Subject matter jurisdiction in this Court is alleged under 42 U.S.C. §§ 1983.

## II

Defendants move pursuant to Rule 56, Fed. R. Civ. P., for partial summary judgment. Specifically, Defendants seek summary dispositions with respect to the claims Plaintiff alleges in Count I for false arrest and unreasonable search and seizure; a summary disposition of the claim in Count II for deprivation of Plaintiff's right to free speech; and a summary disposition of the claim Plaintiff alleges in Count III for retaliation. Defendants acknowledge that Plaintiff is entitled to a jury trial with respect to the claim Plaintiff alleges in Count I for the use by Defendants of excessive force in executing his arrest.

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. In assessing a motion for summary judgment, a Court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013).

I will consider Defendants' motion for summary judgment as to each claim in question, following the order in which the claims are pleaded in the amended complaint.

## III

A.   **False Arrest**

As noted earlier, the parties do not dispute that after arriving on the Division Street scene, Officer Callaway ordered Stanley Coffey to return to and enter his home, Coffey refused to do so, and Callaway arrested him. The nature of the exchanges between these two individuals prior to the

4

arrest are in strenuous dispute.

According to an affidavit sworn to by Coffey on April 9, 2013 and countersigned by his attorney [Doc. 34], when Callaway arrived at the Division Street address on that May 2009 evening in response to George Laughlin's telephoned complaint to the Norwich Police Department, a group off neighbors had gathered in front of Coffey's residence at 58 Division Street. "It is a multicultural neighborhood," Coffey says of where he lived, "and the people in the neighboring houses get along very well." (Laughlin was apparently an exception; the evidence is that he complained to the police frequently about noisy gatherings on the block). "Everyone's kids play on the street and on the side walks," Coffey resumes in his affidavit; "it would not be unusual in the warmer months for the occupants of several houses to congregate, barbecue, play music, play and talk. Such was the scene on the evening of my arrest." [Doc. 34] at 2.

According to Coffey's account, into that peaceful, neighborly and harmonious scene Callaway arrived in response to Laughlin's complaint about noise. This is what Coffey's affidavit says happened next:

> When the police arrived the neighbors congregating at my house disbursed[2] at the request of officer Callaway, and went to their respective houses along Division Street.
>
> At the time Officer Callaway arrived and gave his instructions to disburse, I was in my own yard and, in fact, remained in my own yard throughout the exchange I had with officer Callaway.
>
> Officer Callaway instructed me that I was to go inside my own house. In a respectful manner I responded to officer Callaway that I was not breaking the law and that he did not have the right to tell me to go inside my own house. At the time I made the statement there was no riotous crowd threatening officer Callaway or anyone else; the

---

[2] Thus in original; presumably the verb should be "dispersed."

5

entire noise issue that prompted Mr. Laughlin to call the police had resolved. Officer Callaway responded to my statement that I didn't think I had to go inside my own home by assuming a rigid posture with his arms folded, standing on the public side walk outside my fence, and saying words to the effect that I was to go inside my house. In response I said to officer Callaway words to the effect that I was not trying to be disrespectful by [*sic*; should perhaps read "but"] I didn't think that I had to go inside my house. Afer that exchange officer Callaway stood on the public side walk staring at me for somewhere in the vicinity of ten minutes before officer Meikle arrived, walked up the side walk and, with the assistance of Callaway, grabbed me and projected me head first into the side of a truck, at which point I briefly lost consciousness owing to the impact of my head with the truck body.

*Id.* at 3-4. Coffey also states in his affidavit that "neighbors from different houses were standing on their porches or in their yards watching what was transpiring between me and officer Callaway," but that "at no time, either before the police arrived or afterwards, were there other neighbors who were yelling or screaming at each other or being unreasonably loud." *Id.* at 4. Coffey says that he "had drunk three beers over the course of approximately two and a half to three hours" before his *contretemps* with Callaway, but did not drink any hard liquor during that evening. *Id.*

Officer Callaway's quite different account of these events first appears in the arrest report Callaway prepared later that evening [Doc. 25-4]. Callaway says that at 8:15 p.m. on May 12, 2009, he and Officer Reichard were dispatched to 58 Division Street "for a reported loud party/disturbance. Upon arrival I observed several subjects standing in front of the residence and on the public sidewalk. I could heard [*sic*] several subjects yelling and screaming at each other, and being unreasonably loud even before I exited my police cruiser." Callaway's report continues:

As I approached the residence I was immediately approached by the accused, Stanley Coffey who was highly intoxicated. Stanley began to explain to me his constitutional right to be loud and drink on his own property. I advised Stanley and the other [*sic*] that they were

6

unreasonably loud and causing a disturbance in the neighborhood.  I requested the party be broken up and for the subjects present to move along.  The individuals present complied and left the area going to their respective homes in the neighborhood.  Stanley Coffey and his brother Jason Coffey remained outside their residence, of 58 Division St.

Stanley continually yelled and screamed towards me about his rights to drink and have a "good time," stating as long as he was on his property there was nothing I could do.  Stanley then stated "why don't you guys get in your fucking cruisers and leave."  I requested additional units from Norwich Police Headquarters as a crowd of neighborhood residents were now outside watching.  Stanley even yelled to a neighbor to "break out the video camera."

Stanley continued ignored [*sic*] my request to enter his residence and sober up.  Stanley's mother Linda Matthew even attempted to pursued [*sic*; probably should read "persuade"] her son into calming down and entering the residence.  Stanley's brother Jason Coffey continually told him to "shut up and go inside."

Once several more Norwich Police Officers arrived I approached Stanley who was standing on a sidewalk in front of the main entrance to his residence.  I grabbed Stanley's left wrist and advised him he was under arrest . . . .

[Doc. 25-4] at 4.  Callaway's report states further that Stanley Coffey resisted arrest, and it became necessary for Callaway and police officer Meikle to take Coffey to the ground and handcuff him there before transporting Coffey in a police cruiser to headquarters for booking.

These accounts by Plaintiff Coffey and Defendant Callaway cannot be reconciled.  Coffey either spoke to Callaway in the respectful, nuanced, muted tones of diplomatic *politesse* or he screamed obscenities at him.  At a trial, jurors might listen to both versions and believe what testimony it found credible, in whole or in part.  On this motion for summary judgment, however, the Court accepts as true the factual account given by Coffey, the non-moving party.  The question that arises is whether, viewing the evidence in that light, Defendants are entitled to judgment as a

matter of law.

During oral argument on the motion, the Court asked counsel for their views with respect to the effect, if any, choosing between these *factual* accounts would have upon defendants' liability *in law* for violations of plaintiff's constitutional rights.  I will quote from the transcript ("Tr.") at pages 42-44 (adding internal quotation marks for the sake of clarity):

> THE COURT:  [to Mr. Bradley, counsel for Plaintiff]:  Now, pursuing the analysis a little bit, what Mr. Callaway says to Mr. Coffey in substance is, as Mr. Coffey is standing there on the front yard of his house, Callaway says to Coffey: "Go inside your house." Do you accept that as —
>
> MR. BRADLEY:  That the officer made that statement?
>
> THE COURT:  Said that to him.
>
> MR. BRADLEY:  That is absolutely not controverted.
>
> THE COURT:  Not controverted.  All right.  Then sharpening the focus a little bit more, does the case then turn upon what Mr. Coffey said to Mr. Callaway in response to that direction?  And when I say "what he said," I'm focusing not only on the words that he spoke, but the manner that he employed in speaking them, because it is conceptually possible to imagine Mr. Coffey making two quite different responses to that direction he received from Mr. Callaway. He could have said, in substance: "With great respect, sir, and meaning no disrespect, I would be grateful if you would carefully consider that I am standing on the front lawn of my own house as a law abiding and quiet member of this community; and again, meaning no disrespect, I question your right to tell me to go into my own house.  If you would be kind enough to think about that."  He could have said that.  Or he could have said: "Keep your fucking mouth shut and don't tell me when to get into my own house.  I can stay here on my lawn and be as drunk and as loud as I want, and why don't you take your friends and get out of here?"
>
> Now, these would both be responses, would they not, to the direction that Mr. Callaway gave to Mr. Coffey.  And I don't know, you don't know, and counsel doesn't know.  Nobody knows.  We

8

weren't there.  The question I'm putting to you is, does the case turn, does the case with respect to the asserted constitutional liability of these defendants, in particular Mr. Callaway, turn upon which of those two rather different versions of Mr. Coffey's response is correct?  What — is that what it comes down to?

MR. BRADLEY: I think in great part it comes down to that.

As the colloquy continued, Mr. Bradley concentrated his argument upon the second of the two misdemeanors charged against Coffey: interfering with a police officer in the performance of the officer's duties.  Mr. Bradley posited that "we're not fighting about whether or not it's a breach of the peace, but we're fighting about interference of a police officer."  Tr. 45.  On that aspect of the case, Mr. Bradley contended that if one accepted Coffey's more respectful, less profane and confrontational version of what occurred, the question of interference *vel non* becomes "so fact-bound that there's so many permutations of what direction it could go in."  Tr. 46.  Summing up, Mr. Bradley concluded: "So for me, the simplest exit strategy for your question is to simply say every single thing we are talking about is fact-bound and not appropriate for summary judgment."  Tr. 46.

Mr. Tallberg, counsel for the Defendants as moving parties, replied to Mr. Bradley's contentions on this point by arguing (respectfully, I should add) that the answer to the question posed by the Court made no difference as a matter of law.  I put to Mr. Tallberg the benign version given by Coffey of the pre-arrest interaction between Coffey and Callaway, which led to this exchange:

THE COURT:  Now, under the rules of engagement with which I started off this hearing, I have to accept that.

MR. TALLBERG: Absolutely.  So we don't need to decide that question.  But what that undisputed fact stands for is this: that he was told by the officer to go in, and he responded he was not going to go in.  It doesn't matter how he said it; it matters that he said it because it leads directly to the conclusion that it's passive resistance.  It's passive resistance.

9

Tr. 53-54.

For the concept of "passive resistance," counsel relies principally upon two decisions in this District: *Herpel v. Joyce*, No. cv. B:89-669, 1992 WL 336765 (D.Conn. Sept. 30, 1992), and *Huertas v. Ivanko*, No. 3:11-cv-528, 2013 WL 1193187 (D.Conn. March 25, 2013). In *Herpel*, District Judge Cabranes (as he then was) quoted the provision in Conn. Gen Stat. § 53a-167a that "a person is guilty of interfering with an officer when he obstructs, resists, hinders or endangers any peace officer or fireman in the performance of his duties," and then said:

> The statute defines "interference" to encompass a variety of activities that fall short of actual confrontation or physical contact with police officers – for example, "hindering" or "obstructing" them. The plain meaning of these terms indicates that a person can violate this statute through passive resistance as well as through active obstruction. For that reason, a person could interfere with the performance of an officer's duties merely by refusing to leave an area that the officer was attempting to seal off. The refusal to leave constitutes an interference because it creates a distraction that draws the officer's attention away from his other duties at the scene. This is particularly true where the officers at the scene are greatly outnumbered by onlookers, and evidence of the crime remains at the scene in the custody of the officers. The undisputed facts of this case reveal that the plaintiff was asked three times to leave the crosswalk, and each time he declined to do so – insisting, instead, on engaging the officer in a discussion about his reasons for remaining there. These facts alone constitute a sufficient basis for a reasonable officer to conclude that the plaintiff was "interfering" with the officer's work.

1992 WL 336765, at *5. Counsel for Defendant Callaway quoted this passage from Judge Cabranes's opinion during the oral argument. Tr. 54. In *Huertas*, Judge Bryant, citing and quoting *Herpel*, said that "Huertas' refusal to heed several commands to step away from the person being arrested constituted probable cause for Plaintiff's arrest on the charge of interfering with an officer." 2013 WL 1193187, at *13.

10

In the case at bar, the reliance of Defendants' counsel upon the concept of non-obedience to a police officer's direction as constituting the crime of "interference" inspired the attorneys for both sides to further heights of advocacy as the oral argument drew to a close.  Mr. Bradley, arguing for Plaintiff, sought to distinguish *Herpel* and *Huertas*, the "interference cases," on the ground that those incidents occurred "in a public place, and there was something going on that would have justified the officer's command that somebody disperse.  And that's an important distinction."  Tr. 57.  "This officer," Mr. Bradley said of Callaway, "has to know and cannot escape on qualified immunity, that there is no obligation for someone on their own property to obey a directive for which there isn't even a close-to-a-factual predicate."  Tr. 58.  Mr. Bradley posited the "most absurd case" that Officer Callaway "shows up on Division Street, and Mr. Coffey is out in his yard barbecuing.  He parks his car, he gets out, walks up to Mr. Coffey and says, 'I want you to go into your house.  Go.'  And Coffey says, 'I don't think I have to.'  He gets arrested for not doing it.  Is there qualified immunity there?"  Counsel's question is rhetorical; his argument answers it in the negative.  "If they can get qualified immunity on that," Mr. Bradley said in his peroration,

> there is no longer any inhibition on the power of the police officer to tell you or me, although we wouldn't likely be put in that position, you, me, or anybody in this courtroom to be told for no reason to obey an order of a police officer when you're in your own yard, there's no limit because he has unfettered power to tell you what to do, whether there's a reason for it or not.

Tr. 59-60.

Mr. Tallberg, arguing for Defendants, arrived at the opposite extreme.  He said of Callaway:

> so when he tells the gentleman, "Go in your house," and the gentleman refuses, and there's a crowd about, there's neighbors, he's trying to break up a party on a noise complaint, he's not violating any clearly established law.  There has not been a case put before you,

11

> your Honor, because I'm not aware of any one with comparable facts
> where it has been held by the Second Circuit or a district judge . . .
> that stands for the proposition that you couldn't charge someone with
> interfering under these circumstances, so this would be the first case.
> And what that means under the plain law of this Circuit is that my
> officers are entitled to qualified immunity.

Tr. 54-55.

These contrasting contentions are examples of the advocate's maxim: *ex conjectura horribilis, terrere iudex*.[3]  I am told, on the one hand, that granting Callaway qualified immunity would be a precedent for the destruction of private rights in the Republic, and on the other, that a denial of qualified immunity would defy established Second Circuit authority.  The one certainty is that both sides cannot be correct.

Counsel's submissions at the oral argument properly focus upon qualified immunity, which the Defendant police officers plead as an affirmative defense.  Plaintiff Coffey's § 1983 claim for false arrest "is substantially the same as a claim for false arrest under" relevant state law, *Gonzalez v. City of Schenectady*, 728 F.3d at 155, here the law of Connecticut.  Defendant Callaway's defense is that he had probable cause to arrest Coffey for the Connecticut statutory misdemeanor of interference with Callaway's police duties.  "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983."  *Gonzalez*, 728 F.3d at 155 (citation and internal quotation marks omitted).  A court adjudicating a police officer's defense of qualified immunity to a plaintiff's claim of false arrest begins with a consideration of the legality of the arrest.  It is instructive to quote Chief Judge Jacobs's opinion in *Gonzalez*:

---

[3]  "a horrible hypothesis, to terrify the judge."

> The first question as to qualified immunity is whether the officers violated Gonzalez's rights by arresting him.  That is, whether the officers had probable cause to arrest him at the time of the arrest.  In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested *has committed or is committing a crime.*  The inquiry is limited to whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest.
>
> To ascertain the existence of probable cause, we look at the facts as the officers knew them in light of the specific elements of each crime.

*Id*. (citations and internal quotation marks omitted; emphasis in original).

The absence of probable cause for an arrest does not of itself preclude the arresting officer's defense of qualified immunity.  "In situations where an officer may have reasonably *but mistakenly* concluded that probable cause existed, the officer is *nonetheless* entitled to qualified immunity." *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) (emphases added).  The Second Circuit expanded on that principle in *Gonzalez*:

> The officers therefore lacked probable cause to believe that Gonzalez had attempted to commit either crime.
>
> The right to be free from arrest without probable cause was clearly established at the time of Gonzalez's arrest.  Gonzalez's false arrest claim therefore turns on whether the officers' probable cause determination was objectively reasonable. An officer's determination is objectively reasonable if there was arguable probable cause at the time of the arrest – that is, if officers of reasonable competence could disagree on whether the probable cause test was made.  However, "arguable" probable cause should not be misunderstood to mean "almost" probable cause. If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer.

728 F.3d at 157 (citations, ellipses, and some internal quotation marks omitted).

It is, of course, the trial judge, sitting in the sheltered calm of his or her chambers long after the occurrence of the events in question, who must decide whether "officers of reasonable competence" looking at the facts "known by the arresting officer at the time of the arrest" would agree or disagree that probable cause for the arrest then existed. That exercise requires me to consider what facts were known by Officer Callaway upon his arrival at the Division Street address during the early evening hours of May 29, 2009. It is immediately apparent that the "most absurd case" posited by Mr. Bradley during his argument – a true *reductio ad absurdum* – is not presented by the facts in the case at bar. Callaway was not driving his police cruiser along Division Street for no particular reason when he happened to observe Coffey barbecuing in his yard, decided on a whim to order him to go into his house, and arrested Coffey when he refused to do so. Those facts, it seems clear enough, would result in the conceptual chorus of reasonably competent officers I must consult agreeing unanimously that the arrest was without probable cause. But they do not reflect the reality of the instant case, with particular reference to what Callaway knew before he arrived on the scene and what he observed immediately thereafter.

Callaway knew that he had been dispatched to this particular block on Division Street because a resident had called the police to complain about a loud party and disturbance. Laughlin, the complainant, lived at 54 Division Street. Coffey lived at 58 Division Street. Callaway was also aware, at that time, that the Norwich Police Department records reflected a "history of disturbances at Division Street." Callaway affidavit [Doc. 25-3] at ¶ 15. It is undisputed that when Callaway arrived in his cruiser, a number of people, including Stanley Coffey, had congregated in front of the Coffey residence. Some were consuming bottled beer; music was emanating from a parked car. The parties dispute whether the noise created by this gathering was unreasonably loud, but there is no

reason to suppose that this convivial group of friendly neighbors, presumably gladdened by the end of Winter and the arrival of Spring, were conversing in funereal whispers.  The significant point is that Callaway, upon his arrival, observed a scene that was entirely consistent with the civilian complaint that had brought about police presence: a neighborhood party was making a disturbing amount of noise.

In that circumstance, Callaway decided his best course was to direct the party to break up and its participants to return to their homes.  Backup officer Reichard, when she arrived, assisted in that operation.  All the people involved obeyed those directions except Coffey, who refused repeatedly to go into his house, choosing instead to lecture Callaway about his constitutional rights.  Callaway thereupon arrested Coffey, one of the specified charges being Coffey's interference with Callaway in the performance of Callaway's police duties.

Callaway had probable cause to arrest Coffey on a charge of interference if, at the time of the arrest, Callaway had knowledge of facts and circumstances sufficient to warrant a person of reasonable caution to believe that Coffey was committing that crime.  I conclude that Callaway had probable cause to believe that Coffey's conduct amounted to the misdemeanor of interference with Callaway's performance of his duties, specifically the duty to respond to, and alleviate to the extent necessary and feasible, a civilian complaint of noise disturbance.

In this regard, I derive significant guidance from Judge Cabranes's decision in *Herpel* about the nature and characteristics of interference with a police officer, as that phrase is used in the Connecticut statute.  Judge Cabranes's analysis, quoted *supra*, is persuasive and applicable to the case at bar. Judge Cabranes noted that, as an example of passive resistance, "a person could interfere with the performance of an officer's duties merely by refusing to leave an area that the officer was

15

attempting to seal off."  1992 WL 336765, at *5.  In the case at bar, Callaway decided that in the totality of circumstances his proper course was to break up the party, and clear the street by having the party goers return to their homes.  One may question whether that decision on Callaway's part was correct or necessary, but the question is irrelevant to the issues on this motion: his directions to the neighbors gathering on Division Street were clearly a permissible exercise of the police power. All the individuals present obeyed that direction except Coffey, whose conduct mirrors that of the arrestee in *Herpel*, of whom Judge Cabranes said: "the plaintiff was asked three times to leave the crosswalk, and each time he declined to do so – insisting, instead, on engaging the officer in a discussion about his reasons for remaining there," *id*, confrontational conduct on Coffey's part which engaged the attention of other Division Street residents who lingered on their porches as onlookers. (in *Herpel*, Judge Cabranes observed that interference effect of a refusal to leave a scene is particularly problematic "where the officer at the scene are greatly outnumbered by onlookers," *id*.).

Judge Cabranes concluded in *Herpel:* "These facts alone constitute a sufficient basis for a reasonable officer to conclude that the plaintiff was 'interfering' with the officer's work."  1992 WL 336765, at *5.  I reach the same conclusion in the case at bar.  It is of no legal consequence that the conduct of the arrestee in *Herpel* took place in the apparently public place of a "crosswalk," while it is accepted for purposes of this motion that Coffey's conduct was confined to his private yard space.  Unlike the statutory provision that the breach of the peace charge required the prohibited conduct to be "in a public place," the interference statute contains no such geographic limitation, and it is easy enough to see why: common sense tells us that an individual is equally able to interfere with a police officer's work, whether the miscreant's feet are planted on his own land or on the public place of a crosswalk.

16

The existence of probable cause for Coffey's arrest on a charge of interference requires the entry of summary judgment dismissing that claim. "Since no federal civil rights claim for false arrest can exist where the arresting officer had probable cause, the district court properly granted summary judgment to defendants on this cause of action." *Curley v. Vuillage of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citation omitted).

Alternatively, if Callaway was mistaken in his conclusion that probable cause existed – and, by extension, I am equally mistaken for agreeing with him – nonetheless, Callaway is not liable to Coffey, because at the very least there was *arguable* probable cause at the time of the arrest. This is the teaching of Chief Judge Jacobs's opinion in *Gonzalez*. I conclude without difficulty that if that conceptual chorus of officers of reasonable competence were confronted with the facts as known to Officer Callaway during that May evening on Division Street, some of them would opine that probable cause existed for Callaway to arrest Coffey on a charge of interference. That conclusion is sufficient to sustain Callaway's (and Officer Meikle's) defense of qualified immunity from liability on Coffey's claim of false arrest.

This analysis applies only to Callaway's arrest of Coffey on a charge of interference. To the extent that Coffey was also arrested on a charge of breach of the peace, a summary disposition would be precluded by disputed issues of fact with respect to Coffey's conduct (use of abusive or obscene language, making of an obscene gesture), coupled with a dispute as to whether that conduct occurred "in a public place" (as the statute requires). However, this subject need not be pursued further. The interference charge furnished probable cause for Coffey's arrest. That is sufficient for purposes of this motion.

For the foregoing reasons, the Defendants' motion for summary judgment on Plaintiff's false

arrest claim will be granted.

**B.    Free Speech and Retaliation**

The gravamen of Counts II and III of the amended complaint is that the actions of the Defendant police officers in arresting him, resulting in his prosecution, "were perpetrated against the plaintiff because the plaintiff had declared that the defendant Callaway did not have the right to order the plaintiff to go into his own residence with no legal justification for doing so." Count II, ¶ 18. Count II alleges that this conduct by Defendants violated Plaintiff's "first amendment right to free speech." Count III alleges that by their conduct, Defendants "retaliated against the plaintiff for exercising those rights . . . " The substance of Coffey's speech and the Defendants' conduct are the same in each count. These are both First Amendment retaliation claims, although that noun appears only in Count III.

In *Kerman v. City of New York*, 261 F.3d 229 (2d Cir. 2001), the plaintiff's deprivation of liberty occurred when police officers, during the course of a search of plaintiff's apartment in response to a tip, had plaintiff transported against his wishes to Bellevue Hospital. In his § 1983 action, plaintiff claimed that "the police violated his First Amendment rights by taking him to Bellevue Hospital in retaliation for his derogatory remarks to the police and his threats to sue them." 261 F.3d at 241. The Second Circuit, reversing the district court's summary judgment dismissing that claim, held generally:

> Before plaintiff can survive summary judgment on his First Amendment retaliation claim, he must show that (i)  he has an interest protected by the First Amendment, (ii) the defendants' actions were motivated by or substantially caused by the plaintiff's exercise of that right and (iii) the defendants' actions chilled the exercise of those rights.

18

261 F.3d at 241-42 (citation omitted).

Applying that ruling to the case at bar, Coffey could arguably satisfy the first and third of the three prongs. As for the first prong, Coffey vocally criticized Callaway's direction that Coffey go into his house. The First Amendment protects that speech. In *Kernan,* the Second Circuit held that "Kernan's right to criticize the police without reprisal clearly satisfies the first prong of this test. 'The First Amendment protects a significant amount of verbal criticism and challenge directed to police officers.'" 261 F.3d at 242 (citing and quoting *City of Houston v. Hill*, 482 U.S. 451, 461 (1987)).

As for the third prong, accepting Coffey's disputed account of his encounter with Officers Callaway and Meikle, as I must on this motion, the officers picked Coffey up, slammed his head against the side of a parked truck, and knocked him cold. That is as effective way as any of chilling Coffey's right of free expression.

Nonetheless, Coffey's claims of First Amendment retaliation must fail because he cannot satisfy the second prong delineated in *Kernan*. Coffey is precluded in law from alleging, let alone showing, that Callaway's action in arresting him was "motivated or substantially caused" by the words Coffey spoke to Callaway. That is because, unlike the police officers in *Kernan*, Callaway had probable cause for the principal action he took: arresting Coffey on a charge of interference.

The existence of probable cause for that arrest is explained in Part II.A. of this opinion. Its effect is to preclude a claim that the arresting officer was motivated by illicit purposes. The Second Circuit made that plain in *Curley v. Village of Suffern*, 268 F.3d 65 (2d Cir. 2001). The case arose out of a barroom brawl on August 9, 1994 at the appealingly titled Mugg's Pub, in the Town of Suffern, New York. Plaintiff Curley, a part owner of that establishment, participated in the altercation. Police who responded arrested Curley on charges of assault, resisting arrest, and

obstruction of governmental administration.  The Second Circuit eventually held that the officers had probable cause to make those arrests.  268 F.3d at 69-70.  Ultimately the felony assault charge against Curley was dismissed and a jury acquitted him on the remaining misdemeanor counts.

Curley then brought a § 1983 action against, *inter alia*, the Town mayor and police chief. The complaint included a First Amendment retaliation claim Curley asserted against the mayor and the police chief.  There had been a town election in 1993, during which Curley ran unsuccessfully against the mayor and publicly criticized the mayor and police chief for their conduct in office.  The Second Circuit noted: "Plaintiff believes his arrest on the night of August 9, 1994 —  a number of months after the election — was in retaliation for such criticism."  268 F.3d at 73.  The Second Circuit barred this claim entirely. The court of appeals held: "As to the second element, because defendants had probable cause to arrest plaintiff, an inquiry into the underlying motive for the arrest need not be undertaken." *Id*.

For that proposition, *Curley* cited *Singer v. Fulton County Sheriff*, 63 F.3d 110 (2d Cir. 1995), a First Amendment retaliation claim arising out of a prosecution.  In *Singer*, the Second Circuit stated with equal strength and at somewhat greater length:

> It is, however, insufficient to merely plead facts upon which an inference of retaliatory prosecution may be drawn.  We have held previously that if the officer either had probable cause or was qualifiedly immune from subsequent suit (due to an objectively reasonable belief that he had probable cause), then we will not examine the officer's underlying motive in arresting and charging the plaintiff.  As noted, there was probable cause to arrest and charge Singer with petit larceny.

63 F.3d at 120 (citations omitted).

In both *Singer* and *Curley* the Second Circuit, after the pronouncements I have quoted, went

on to hold that the plaintiff had not shown any chilling effect upon him, principally because his own conduct did not change after the arrests.  This has to do with the third prong articulated in *Kerner*, and perhaps Coffey could satisfy that prong in the case at bar.  But I do not read the Second Circuit's opinions in *Curley* and *Singer* as conditioning the preclusive effect of probable cause in a retaliation case (the *motivation* prong) upon the existence *vel non* of a *chilling* effect (the third prong).  The Second Circuit has said in these decisions, with clarity and brevity, that if an officer had probable cause to make an arrest, "then we will not examine the officer's underlying motive in arresting and charging the plaintiff."  63 F.3d at 120 (citations omitted).  If the effect of probable cause is to preclude judicial inquiry into an arresting  officer's motivation — clearly the rule in this Circuit — then an arrestee cannot ask about or attempt to prove that the officer's "underlying motive" was retaliatory, or indeed anything else.

The practical consequence of that rule is this: A finding that an arresting officer had probable cause for the arrest, or qualified immunity from subsequent suit on account of it, precludes as a matter of law a claim by the arrestee that the arrest was motivated by an intent to retaliate for the arrestee's exercise of his constitutional rights.  This Court has made those alternative findings in the case at bar.

Accordingly, the Defendants are entitled to summary judgment on Counts II and III of the amended complaint.

## IV

For the foregoing reasons, Defendants' motion for partial summary judgment [Doc. 25] is GRANTED, as to part of Count I of the Amended Complaint, in a manner consistent with this Ruling.

Summary judgment is GRANTED to Defendants on the claims alleged in Count II and in Count III.

Plaintiff's claim for the use of excessive force by Defendants during the arrest at issue remains for further litigation.  A separate scheduling Order for the submission of a Joint Trial Memorandum will be entered by the Court.

It is SO ORDERED.

Dated:  New Haven, Connecticut
       February 19, 2015

                                        /s/ *Charles S. Haight, Jr.*
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge